**UNITED STATES of America, Plaintiff-Appellee,**

v.

**John O. TILTON, Defendant-Appellant.**

**No. 79–5108.**

United States Court of Appeals, Fifth Circuit.

Jan. 23, 1980.

Rehearing Denied Feb. 22, 1980.

John Paul Howard, Jacksonville, Fla., for defendant-appellant.

Katherine Winfree, Atty., Dept. of Justice, T. George Gilinsky, Wade Livingston, Atty., Washington, D. C., for plaintiff-appellee.

Before THORNBERRY, CHARLES CLARK and KRAVITCH, Circuit Judges.

THORNBERRY, Circuit Judge:

Appellant John O. Tilton was convicted in the United States District Court for the Middle District of Florida on four counts of mail fraud in violation of 18 U.S.C. § 1341, one count of interstate travel to facilitate an unlawful activity in violation of 18 U.S.C. § 1952, and one count of conspiracy

to commit mail fraud and to violate the Travel Act in violation of 18 U.S.C. § 371. Appellant was sentenced to one year's imprisonment for violation of the Travel Act, 18 U.S.C. § 1952, and was given four years probation on the mail fraud and conspiracy counts. Tilton was also fined $2,000 for his part in the conspiracy.

The government's evidence at trial showed that appellant served as a maintenance manager for Sea-Land Incorporated (Sea-Land) and he was responsible for company projects in the southeastern portion of the United States (Texas to South Carolina). Sea-Land is in the business of manufacturing containers for shipping freight as well as wheeled chassis that attach to the freight containers so they may be moved over land. In January 1976, Sea-Land initiated what was known as the "Saudi Arabian program" in which a quantity of 508 chassis were to be reconditioned and sent to Saudi Arabia. This called for modification of a group of chassis for use in sand with the installation of new tires as well as a complete overhaul with new parts as needed. It was decided that seventy of the chassis that were to be remodeled were to come from Jacksonville, Florida, and seventy from Charleston, South Carolina. Tilton was responsible for locating outside repair shops in the two areas which were capable of doing the necessary reconditioning work because Sea-Land could not complete the job before the project deadline.

In Charleston, South Carolina, Tilton selected Streaker Marine, Incorporated (Streaker) to do the chassis reconditioning work. Streaker is owned in part by Robert Brenner and Jim Fiore. In March 1976, Fiore called Brenner and told him that Tilton would have to be paid a "commission" of $20 for each of the 70 chassis that Streaker would be repairing for a total of $1,400. Fiore also told Brenner to "bury" the payment in the books as either travel and entertainment expenses, parts, or supplies. In July 1976, Fiore called Brenner again and told him that he would have to produce the $1,400 soon. On August 25, 1976, after receiving another call from Fiore, Brenner wrote a check for $1,400

payable to cash. Brenner cashed the check, put the money in a plain white envelope, and gave the money to Tilton in the lounge of a Charleston motel stating, "This is for you, John." Tilton put the envelope in his pocket and left without any conversation about the purpose for the payment. Brenner called Fiore several days later and told him the payment had been made to Tilton.

In Jacksonville, Florida, Tilton selected United Trailer Service, Incorporated (UTS) to do the chassis reconditioning work. UTS is owned in part by Joseph Cotrone and Robert Gillespie. In February 1976, Cotrone called Gillespie and informed him that UTS would be doing some work for Sea-Land and that they would have to "plug in $20 a chassis" for Tilton and "add $20 to the cost of each chassis." Cotrone also told Gillespie that Fiore was his partner and that Fiore was also refurbishing chassis and paying $20 per chassis to Tilton. After UTS reconditioned each chassis, an invoice was filled out showing the labor and materials used. These invoices were then mailed to Sea-Land for payment. But the invoices did not accurately reflect the work done on the chassis because many of them were inflated by adding an hour's labor that had not been performed or by incorrectly showing that a part had been replaced. While each invoice was not overstated by exactly $20, all of the invoices taken together were inflated to produce the $20 bribe per chassis for Tilton. The parts that were erroneously listed as replaced were almost impossible to inspect or they were hidden by paint. While each invoice was not false, testimony revealed that at least one invoice in every group mailed on specified dates was false. On May 6, 1976, Gillespie wrote a check payable to cash for $500, cashed the check, and paid Tilton the money claiming that it was "per the agreement between he and Joe [Cotrone]." The payments were hidden in the business records as expense account payments.

██ Appellant initially argues that the trial court abused its discretion when it denied appellant's request for a 60-day con-

tinuance of the trial date. The determination of when to allow a continuance is committed to the sound discretion of the trial judge. His ruling will not be disturbed on appeal unless there has been an abuse of discretion. *Gandy v. Alabama,* 569 F.2d 1318 (5 Cir. 1978); *United States v. Smith,* 591 F.2d 1105 (5 Cir. 1979); *United States v. Harbin,* 601 F.2d 773 (5 Cir. 1979). The denial of a continuance will be reviewed in light of the reasons presented to the trial court and considered by the trial judge at the time the request is denied. *United States v. Henderson,* 588 F.2d 157 (5 Cir.), *cert. denied,* 440 U.S. 975, 99 S.Ct. 1544, 59 L.Ed.2d 794 (1979); *United States v. Uptain,* 531 F.2d 1281 (5 Cir. 1976). Based on an examination of the circumstances involved in this case, there does not appear to be an abuse of discretion. While the trial judge did not grant appellant a 60-day continuance, he offered Tilton a one-week continuance and this offer was rejected. The reason offered by appellant's attorney for the continuance was that he needed time to examine copies of inspection reports that employees of Sea-Land made regarding the repair work accomplished by UTS. While worksheets existed for each of the repaired chassis, the columns on the worksheets where a record of any inspection could be made were left blank. Therefore, appellant sought a continuance to examine non-existent records. The other reason that appellant offered for granting a continuance was to locate UTS records which demonstrated the work actually done by UTS. But this reason was never presented to the trial court after testimony as to the existence of these records was elicited. Therefore, it may not be considered by this court in determining whether the trial judge abused his discretion. *United States v. Uptain, supra.* An examination of the above described facts clearly indicates that there was no abuse of discretion.

■ Appellant also contends that the trial court improperly permitted the jury to consider out-of-court statements made by his alleged co-conspirators. While this court adopted new rules governing admission of co-conspirator statements in *United States v. James,* 590 F.2d 575 (5 Cir.) (en banc), *cert. denied,* 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979), our decision in *United States v. Robinson,* 591 F.2d 1202 (5 Cir. 1979), stated that "it is clear that *James* only applies prospectively." *Id.* at 1204. Because the trial of this case ended on October 30, 1978, this issue is governed by this court's earlier decision in *United States v. Apollo,* 476 F.2d 156 (5 Cir. 1973). *Apollo* requires the trial judge to give a cautionary instruction to the jury on the limited use of evidence of co-conspirators' statements. This court in *Apollo* noted that the Supreme Court's decision in *Lutwak v. United States,* 344 U.S. 604, 73 S.Ct. 481, 97 L.Ed. 593 (1953), established the following requirement:

> . . . a minimum obligation on the trial judge in a conspiracy case in which extrajudicial statements of alleged co-conspirators are proffered to give a cautionary instruction on the limited uses of hearsay testimony, explaining clearly to the jury the requirement that the conspiracy itself and each defendant's participation in it must be established by independent non-hearsay evidence which must be given either prior to the introduction of any evidence or immediately upon the first instance of such hearsay testimony. *See Menendez v. United States,* 393 F.2d 312 (5 Cir. 1968), *cert. denied,* 393 U.S. 1029, 89 S.Ct. 639, 21 L.Ed.2d 572 (1969).

\* \* \* \* \* \*

Testimony concerning the declarations of co-conspirators *may* be admitted before the existence of the conspiracy is established by independent evidence. But the unmistakable hazard of allowing this procedure highlights the need for the court to condition the minds of the jurors so that they will not fail to remember that none of this hearsay will bootstrap the necessary establishment of the conspiracy itself by firsthand proof.

Therefore, we must first determine whether the trial judge gave a proper cautionary instruction to the jury at the time the hear-

say testimony was offered so as to defuse the dangerous nature of the co-conspirators' hearsay statements.

Appellant's objection is addressed to the testimony of Brenner and Gillespie with respect to the content of telephone conversations they had with Fiore and Cotrone relating to the payments made to Tilton. The record reveals that the trial judge properly instructed the jury concerning the co-conspirators' statements in accordance with the requirements of *Apollo* as follows:

You should remember that any admission or incriminating statement made or act done outside of court by one person may not be considered as evidence against any defendant who was not present and did not hear the statement made or see the act done. However, if you find beyond a reasonable doubt that from independent evidence a conspiracy existed and that a defendant or this defendant was one of the members thereof, then any such statement you find to have been knowingly made and acts knowingly done during the continuance of the conspiracy and in furtherance of some object or purpose of the conspiracy by any person likewise found to be a member of the conspiracy may be considered by you as evidence against the defendant found to have been a member, even though the statement and act may have occurred in the absence of and without the knowledge of the defendant.

In determining whether a conspiracy existed, you should consider the actions and declarations of all of the alleged participants. However, in determining whether a particular defendant was a member of a conspiracy, if any, you should consider only his acts and statements. He cannot be bound by the acts or declarations of other participants unless a conspiracy existed and unless you find by a reasonable doubt that he was one of its members. Now, you should be guided by that instruction as to the law in considering any such statements that the witness just alluded to.

This instruction was given both times that the hearsay statements were offered.

Since the trial judge satisfied the requirements of *Apollo*, the next question is whether the nonhearsay proof, independent of the co-conspirator statements, established a prima facie case of the existence of a conspiracy and appellant's participation in that conspiracy sufficient to warrant the admission of the co-conspirator statements. *United States v. Robinson,* 591 F.2d 1202 (5 Cir. 1979); *United States v. James,* 590 F.2d 575 (5 Cir. 1979); *United States v. Oliva,* 497 F.2d 130 (5 Cir. 1974). The nonhearsay testimony established the following: (1) Tilton was given the responsibility for selecting the repair shops to do the work for Sea-Land, (2) Tilton selected Streaker and UTS, (3) Tilton was not authorized to receive compensation from either Streaker or UTS, (4) Tilton was paid a "commission" of $1,400 by Brenner of Streaker in the lounge of a Charleston, South Carolina, motel, (5) Tilton was paid $500 by Gillespie of UTS, (6) both Streaker and UTS devised schemes to hide these payments in their corporate records, and (7) UTS generated the funds that it paid to Tilton by falsely inflating its invoices. The proof in this case clearly meets the prima facie standard. Because proof independent of the co-conspirators' hearsay statements was sufficient to establish a prima facie case of the conspiracy's existence and Tilton's participation in it, the trial court properly admitted the alleged co-conspirators' statements. *See Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942); *United States v. Metz,* 608 F.2d 147 (5 Cir. 1979); *United States v. Oliva, supra; United States v. Apollo, supra.* The trial judge held a hearing out of the jury's presence to determine the admissibility of hearsay statements made by the co-conspirators. He determined that a preponderance of the evidence clearly demonstrated that a conspiracy existed and that there was sufficient independent evidence to show that Tilton was a member of that conspiracy. He then allowed the hearsay statements to be admitted into evidence but only when accompanied by a proper *Apollo* instruction. The record reveals the trial judge properly

permitted the jury to consider out-of-court statements made by the alleged co-conspirators.

■ Appellant also complains that the proof established two separate conspiracies rather than the single conspiracy alleged in the indictment so there is a prejudicial variance between the allegations of the indictment and the proof. This court must first determine whether a variance between the evidence at trial and the single conspiracy charged in the indictment exists. If such a variance is present, the next inquiry is whether substantial rights of the appellant have been affected. *United States v. Baldarrama,* 566 F.2d 560 (5 Cir. 1978), *cert. denied,* 439 U.S. 844, 99 S.Ct. 140, 58 L.Ed.2d 145 (1979); *see also United States v. Cruz,* 478 F.2d 408 (5 Cir.), *cert. denied,* 414 U.S. 910, 94 S.Ct. 259, 38 L.Ed.2d 148 (1973). The principal factors that this court examines when resolving the issue of a prejudicial variance are the existence of a common goal, the nature of the scheme, and an overlapping of participants in the various dealings. *United States v. Becker,* 569 F.2d 951 (5 Cir. 1978), *cert. denied,* 439 U.S. 865, 99 S.Ct. 188, 58 L.Ed.2d 174 (1979); *United States v. Morrow,* 537 F.2d 120 (5 Cir. 1976), *cert. denied,* 430 U.S. 956, 97 S.Ct. 1602, 51 L.Ed.2d 806 (1977); *United States v. Perez,* 489 F.2d 51 (5 Cir. 1973), *cert. denied,* 417 U.S. 945, 94 S.Ct. 3067, 41 L.Ed.2d 664 (1974). Each of these factors is present in this case to demonstrate the existence of a single conspiracy.

■ The presence of a common goal was found on three levels. As far as Sea-Land was concerned, the "Saudi Arabian project" was a single program with the single goal of refurbishing 508 chassis. This was the case even though the work was to be performed at different locations. As far as the conspirators were concerned, the single common goal was to obtain Sea-Land contracts by bribing a Sea-Land employee. The common goal toward which Tilton's various activities were directed was the increase of his personal wealth by a scheme involving the payment of a "commission" to him for each chassis refurbished.

The nature of the scheme also involved a single conspiracy. In both cases, Tilton arranged for Sea-Land to award the chassis repair contracts in return for a "commission" of $20 per chassis. Cotrone owned 25% of UTS and Fiore, described by Cotrone as his partner, was part owner of Streaker. Tilton testified that both shops were selected on Cotrone's advice. Brenner of Steaker and Gillespie of UTS met in February or March of 1976 and discussed the chassis reconditioning project. The scheme was of such a nature that the participants knew that they were involved in a single conspiracy.

The testimony also revealed considerable overlapping of participants in the various dealings. Of course, Tilton was the individual who received the "commission" from both Streaker and UTS in conjunction with a common scheme. Also, Fiore of Streaker and Cotrone of UTS were described as partners. The evidence clearly supports the jury's decision that the facts show a single conspiracy.

■ But even if a variance exists between the proof at trial and the indictment, such a variance will not constitute reversible error unless substantial rights of the defendant are affected. *United States v. Baldarrama, supra; United States v. Perez, supra.* In this case, Tilton has shown no prejudice due to the alleged variance.

■ Appellant next contends that the evidence was not sufficient to support his convictions for conspiracy, mail fraud, and violating the Travel Act. This claim is without merit.

We will first examine appellant's claim with respect to the alleged Travel Act violation. The Travel Act provides in part:

(a) Whoever travels in interstate or foreign commerce or uses any facility in interstate or foreign commerce, including the mail, with intent to—

(1) distribute the proceeds of any unlawful activity; or

(2) commit any crime of violence to further any unlawful activity; or

(3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any 'unlawful activity, and thereafter performs or attempts to perform any of the acts specified in subparagraphs (1), (2), and (3), shall be fined not more than $10,000 or imprisoned for not more than five years, or both.

(b) As used in this subsection "unlawful activity" means (1) any business enterprise involving gambling, liquor on which the Federal excise tax has not been paid, narcotics or controlled substances (as defined in section 102(6) of the Controlled Substances Act), or prostitution offenses in violation of the laws of the State in which they are committed or of the United States, or (2) extortion, *bribery*, or arson in violation of the laws of the State in which committed or of the United States.

18 U.S.C. § 1952 (emphasis added). The Supreme Court recently held, in an opinion affirming a decision of this court, that "bribery," as mentioned in the Act, includes not only bribery of a public official but also bribery of a private employee in violation of a state criminal statute. *Perrin v. United States,* — U.S. ——, 100 S.Ct. 311, 62 L.Ed.2d 199 (1979), *aff'g* 580 F.2d 730 (5 Cir. 1978). The payment of $1,400 by Brenner to Tilton in the lounge of a Charleston, South Carolina motel constituted the offense of bribery, punishable under South Carolina law. S.C. Code § 16–17–540 (1976). Therefore, the only remaining question is whether Tilton's interstate travel from Florida to South Carolina was accomplished with the *intent* to facilitate this unlawful activity. It is enough that the intent is motivated in part by the unlawful activity even if one motivating factor involves. a legitimate purpose. *United States v. Gooding,* 473 F.2d 425 (5 Cir.), *cert. denied,* 412 U.S. 928, 93 S.Ct. 2752, 37 L.Ed.2d 155 (1973). Tilton's acceptance of the bribe soon after arriving in South Carolina supports the inference that the trip was motivated, at least in part, by the bribe. The fact that Tilton travelled in part for an improper reason may be inferred from his actions immediately after the travel. *Id.* Therefore, the evidence appears sufficient to support Tilton's conviction for violation of the Travel Act.

We will next examine appellant's claim with respect to his conviction for conspiracy to violate the Travel Act and the mail fraud statute. The evidence mentioned above is sufficient to support the jury's finding that Tilton conspired to receive bribes from Streaker in exchange for selecting that shop to do work for his employer. This constitutes an "unlawful activity" as mentioned in the Travel Act and Tilton was involved in the conspiracy to violate this Act.

The evidence is also sufficient to support a finding that Tilton conspired to commit mail fraud. This court has stated that to sustain a conviction for conspiracy to commit mail fraud, the evidence must merely show a scheme or artifice to defraud, *United States v. Knight,* 607 F.2d 1172 (5 Cir. 1979); *United States v. Toney,* 598 F.2d 1349 (5 Cir. 1979), use of the mails caused by someone associated with the scheme, *Pereira v. United States,* 347 U.S. 1, 74 S.Ct. 358, 98 L.Ed. 435 (1954), and use of the mails in executing the fraud, *United States v. Toney, supra; United States v. Netterville,* 553 F.2d 903 (5 Cir. 1977), *cert. denied,* 434 U.S. 1009, 98 S.Ct. 719, 54 L.Ed.2d 752 (1978); *Kann v. United States,* 323 U.S. 88, 65 S.Ct. 148, 89 L.Ed. 88 (1944). The scheme of inflating the invoices that were mailed to Sea-Land in order to generate the "commissions" to be paid to Tilton defrauded Sea-Land by increasing the cost of each chassis by at least $20. *See Abbott v. United States,* 239 F.2d 310 (5 Cir. 1956). The UTS conspirators (Gillespie, Cotrone) executed this fraudulent scheme by mailing the padded invoices to Sea-Land. It is not necessary to demonstrate which invoices were fraudulent. Since the defrauded funds were used to pay Tilton his "commissions," the evidence is clearly sufficient to demonstrate that Tilton participated in the *conspiracy* to commit mail fraud through a scheme to defraud and use of the mails to execute that fraud.

Because the evidence is sufficient to demonstrate that Tilton was a member of a conspiracy to commit mail fraud, he can also be convicted of the substantive offense based upon acts committed by a co-conspirator in furtherance of the conspiracy as long as the acts fall within the scope of the conspiracy and could reasonably be foreseen as a necessary or natural consequence of the unlawful agreement. *Pinkerton v. United States,* 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946); *United States v. Moreno,* 588 F.2d 490 (5 Cir.), *cert. denied,* 441 U.S. 936, 99 S.Ct. 2061, 60 L.Ed.2d 666 (1979); *United States v. Michel,* 588 F.2d 986 (5 Cir. 1979). A party to a continuing conspiracy can be held responsible for the substantive offenses committed by the co-conspirators if acts were committed in furtherance of a conspiracy even though Tilton neither participated in the act of mailing the padded invoices nor actually knew about it. *United States v. Michel, supra; United States v. Scruggs,* 583 F.2d 238 (5 Cir. 1978). The mailing of the inflated invoices furthered the conspiracy and was a natural consequence of the unlawful agreement since the bribe money would have to be generated from some source. The most likely source was Sea-Land since UTS agreed to pay the bribe in exchange for a profitable contract. Consistent with this thinking, one could reasonably foresee that the money would not come from the reserves of UTS but from Sea-Land in the form of overcharges.

Nor do we regard Tilton's remaining contentions as substantial or as warranting extended discussion. Tilton complains that the trial court (1) gave an improper *Allen* charge, (2) improperly denied Tilton's request to take the depositions of prospective government witnesses, and (3) improperly instructed the jury on the elements of conspiracy. An examination of the record reveals that these complaints neither possess factual merit nor represent any abuse of the trial court's sound discretion.

AFFIRMED.