**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Sheldon L. HORTON,
Defendant–Appellant.**

No. 87–1453.

United States Court of Appeals,
Sixth Circuit.

Argued March 14, 1988.

Decided May 25, 1988.
Rehearings Denied Aug. 1, 1988.

Harold Gurewitz (argued), Detroit, Mich., for defendant-appellant.

John R. Roth (argued), Asst. U.S. Atty., Detroit, Mich., for plaintiff-appellee.

Before MILBURN and BOGGS, Circuit Judges, and ALDRICH, District Judge.[*]

MILBURN, Circuit Judge.

Defendant-appellant Sheldon L. Horton appeals from his conviction on nine counts of mail fraud. For the reasons that follow, we affirm.

## I.

Defendant Horton was convicted of mail fraud after he and codefendant Stephen Bandawat were jointly tried for their participation in a scheme to defraud Chrysler Corporation of some $479,000.00 during the course of production of door hinges for the Chrysler K-car. Although the defendants did not contest that the transactions actually occurred, both contended that they were not guilty of defrauding Chrysler Corporation. Only Horton's conviction is the subject of this appeal.

During the spring of 1980, Horton was employed as a purchasing agent for Ford Motor Company. At that time, he was informed that Ford anticipated a reduction

---

[*] Honorable Ann Aldrich, Judge, United States District Court for the Northern District of Ohio, sitting by designation.

in personnel, and that as a consequence, he could be laid off.

In August 1980, Horton received an offer of employment from Chrysler Motor Corporation. Horton began work as a purchasing agent manager for Chrysler on October 1, 1980. Before beginning his first day of work, Horton was required to complete a package of personnel forms, including Chrysler's standard conflict-of-interest policy statement.

In August 1980, Horton met Stephen Bandawat, the owner of Carsonville Metal Products. In addition to owning Carsonville, Bandawat controlled Southwest Sales and Engineering. Carsonville produced metal stampings and fabrications at its facilities in Carsonville and Port Sanilac, Michigan. At the time of the initial meeting between Horton and Bandawat, Horton informed Bandawat that he was employed by Ford Motor Company but anticipated leaving to become an independent manufacturer's representative. Bandawat advised Horton that his company was looking for more work which would involve utilization of Carsonville's 300–ton press. Horton replied that he thought he could find work for Carsonville, but Horton made it very clear that Bandawat would be required to pay a commission on sales.[1]

In October 1980, after Horton began to work at Chrysler, he met with Bandawat at the Carsonville plant. At that time, Horton informed Bandawat that he believed there were some parts of the Chrysler K-car that Carsonville could produce. Approximately two weeks later, Bandawat and Horton met again to discuss the drilling of the K-car door hinges. At that meeting, Bandawat and Horton agreed that Bandawat would pay Horton a five per cent commission on sales in exchange for securing the business with Chrysler. John Carney, who was vice-president of finance at Carsonville, testified that there was no written contract between the parties, but only a handshake agreement. The "commission" payments were actually made from Carsonville Prod-

ucts to Shelmar Corporation, an entity set up by Horton for receipt of sales commissions.

In April 1981, Carsonville stopped making direct payments to Shelmar. At that time, the parties began to fear that Chrysler would discover the arrangement, and Horton advised Bandawat that he would feel better about the arrangement if he did not receive payments directly from Carsonville Metal Products. Accordingly, Bandawat and Richard Pagac, a CPA, formed a sales agreement between Carsonville Metal Products and Southwest Sales and began paying Shelmar from the Southwest Sales account. After John Carney began issuing checks drawn on the Southwest Sales account, he retroactively set up a note converting the payments that had already been made from Carsonville into a loan that was to be repaid by Shelmar Sales. Carney took this action at the direction of Stephen Bandawat, and the reason for this transaction was to avoid any documented payments to Shelmar from Carsonville.

Bandawat testified that, at the early stages of this arrangement, he always made his payments to Shelmar in a timely manner. However, during the early months of 1981, Carsonville experienced cash flow difficulties and the payments were not always made in a timely manner. During this time, Horton threatened to cut off Carsonville's work unless he received timely payment. Bandawat further testified that he believed Horton would cut him off, that he had made a substantial retooling investment in order to perform the Chrysler work, and that he was afraid of the consequences that would have resulted if the work had been withdrawn at that time.

Roger Kansier, a former vice-president of manufacturing for Carsonville, testified that in early 1981 Bandawat instructed him to short-ship the Chrysler door hinges by ten per cent because Carsonville was not making enough money on the Chrysler job. The short-shipments began during the

---

**1.** Horton denies that this initial meeting took place. He testified that he first met Bandawat in October 1980.

same time period in which Horton began to exert pressure on Carsonville.

Bandawat characterized this relationship as one involving extraordinary economic duress. He testified that, in the beginning, he had no reason to believe that it was inappropriate to pay Horton a commission on sales. He further testified that he continued to make the payments because he feared losing the Chrysler business.

Horton painted a very different picture of the business relationship he established with Carsonville. He did not attempt to justify the amount of money, some $250,-000.00, that he made during the course of this two-year relationship. However, it was his position that he did not know about the short-shipments to Chrysler, and that he had no reason to believe that Chrysler was economically damaged by his relationship with Bandawat. Kansier testified that, to his knowledge, Horton was not actually aware of the short-shipments. An auditor for Chrysler indicated that the cost of the short-shipments to Chrysler was approximately $479,467.00.

The proof presented at the trial was that Horton forged other such relationships with manufacturers who supplied products to Ford Motor Company while he was employed by Ford. On direct examination, Horton testified that he entered into a representation agreement with Gagnier Fiber products, which provided for a five per cent commission on the total cost of all invoices shipped by Gagnier to Ford. At that time, Horton was still employed as a buyer at Ford Motor Company. This testimony was consistent with Horton's testimony that he attempted to become a manufacturer's representative, and it was presented in an attempt to negate the intent element of mail fraud.

In order to rebut this testimony, the government called John Sokol, the owner of Gagnier. Sokol testified that he paid Horton a five per cent kickback, half of which was kicked back to Sokol personally. On redirect, Sokol testified that he paid Horton not because he needed a manufacturer's representative, but because he would not get any business from Ford if he refused.

In May 1983, the FBI began to investigate the relationship between Carsonville and Horton. On November 13, 1986, Bandawat and Horton were jointly charged in a ten-count indictment. Each count contained a separate violation of 18 U.S.C. § 1341, which prohibits use of the mails for the purpose of effectuating any scheme or artifice to defraud. Count I was dismissed on the government's motion before trial, and a jury trial on the remaining counts began on January 26, 1987. On February 13, 1987, Horton was convicted on all the remaining counts. On April 20, 1987, Horton was sentenced to two years imprisonment for each count, to be served concurrently.

This timely appeal follows. The issues presented for review by the court are:

(1) whether the district court committed reversible error in denying Horton's motion for a severance;

(2) whether the trial court committed reversible error in denying Horton's motions for a judgment of acquittal and mistrial on the ground that the proof at trial substantially varied from the charges in the indictment;

(3) whether the district court erred in refusing to grant his motion for a judgment of acquittal because the evidence failed to establish that Horton engaged in conduct proscribed by the mail fraud statute;

(4) whether the trial court committed reversible error by failing to completely instruct the jury on the concept of aiding and abetting;

(5) whether the district court committed reversible error by using the term "conspiracy" in its charge;

(6) whether the trial court committed reversible error by failing to accurately define the term "scheme or artifice to defraud";

(7) whether the trial court committed reversible error by making inadequate findings under this court's decision in *United States v. Enright;*

(8) whether the district court committed reversible error in allowing Stephen Bandawat to testify as to statements made to him by Sheldon Horton; and

(9) whether the district court committed reversible error in allowing John Sokol to testify in rebuttal regarding his association with Sheldon Horton.

## II.

### A.

Initially, Horton contends that the district court abused its discretion in refusing to grant his motion for a severance pursuant to Rule 14, Federal Rules of Criminal Procedure. He argues that because his defense was "fundamentally antagonistic" to Bandawat's, their joint trial constituted a deprivation of due process.

The law in this circuit is clear that a defendant seeking to overturn a trial court's decision not to sever the trials of codefendants who allegedly participated in the same offense bears a heavy burden. *See, e.g., United States v. Bibby,* 752 F.2d 1116 (6th Cir.1985), *cert. denied,* 475 U.S. 1010, 106 S.Ct. 1183, 89 L.Ed.2d 300 (1986). The district court's decision to deny severance "will be overruled on appeal only for a clear abuse of discretion." *United States v. Causey,* 834 F.2d 1277, 1287 (6th Cir. 1987). A defendant must make a strong and compelling showing of prejudice before reversal will be granted. *Bibby,* 752 F.2d at 1123; *see also Causey,* 834 F.2d at 1287; *United States v. Day,* 789 F.2d 1217 (6th Cir.1986). There is a strong policy in favor of joint trials when charges will be proved by the same series of acts, *see United States v. Hamilton,* 689 F.2d 1262, 1275 (6th Cir.1982), *cert. denied,* 459 U.S. 1117, 103 S.Ct. 754, 74 L.Ed.2d 971 (1983), and there is a presumption that the jury will be able to sort out the evidence applicable to each defendant and render its verdict accordingly. *See United States v. Thomas,* 728 F.2d 313 (6th Cir.1984).

Separate trials are not mandated merely because one defendant claims that he and a codefendant will present antagonistic defenses. "Different defenses by co-

defendants do not require a severance of their trials. To prevail [on a motion for a severance], the defendants must show that 'antagonism between co-defendants will mislead or confuse the jury.'" *United States v. Kendricks,* 623 F.2d 1165, 1168 (6th Cir.1980) (per curiam) (quoting *United States v. Vinson,* 606 F.2d 149, 154 (6th Cir.1979), *cert. denied,* 444 U.S. 1074, 100 S.Ct. 1020, 62 L.Ed.2d 756 (1980)). The mere fact that each defendant "points the finger" at another is insufficient; the defendant must show that the antagonism confused the jury. *Day,* 789 F.2d at 1224. As no such showing has been made in the present case, we conclude that the district court did not abuse its discretion in refusing to grant defendant Horton's motion for a severance.

### B.

Horton next argues that the district court committed reversible error in denying his motions for judgment of acquittal and for a mistrial on the basis of an alleged variance between the indictment and the proof at trial. Horton argues that the indictment charged the defendants with participation in a single scheme and that the proof at trial established the existence of two separate schemes.

For purposes of determining the existence of a variance, the principles applicable to conspiracies may be applied to mail fraud prosecutions. *See United States v. Camiel,* 689 F.2d 31, 35 (3d Cir.1982). "If an indictment alleges one [scheme], but the evidence can reasonably be construed only as supporting a finding of multiple [schemes], the resulting variance ... is reversible error if the appellant can show that he was prejudiced thereby." *United States v. Warner,* 690 F.2d 545, 548 (6th Cir.1982); *see also United States v. Mack,* 837 F.2d 254 (6th Cir.1988). In determining whether a variance exists between the number of schemes alleged in the indictment and the number supported by the proof at trial, several factors are utilized. The most significant are "(1) the existence of a common goal, (2) the nature of the

scheme, and (3) [the] overlapping of participants...." *United States v. Richerson*, 833 F.2d 1147, 1153 (5th Cir.1987).

To support his argument that more than one scheme existed, Horton places heavy reliance on *Camiel*, 689 F.2d at 31. In *Camiel*, the indictment charged that the defendants participated in a scheme of placing Democratic Party loyalists on the Pennsylvania House and Senate payrolls with the understanding that they were not required to perform any work for the Pennsylvania legislature. The court concluded that the evidence at trial established not a single unified scheme but at least two, and perhaps four, separate schemes and the absence of substantial evidence linking them.

Several factors went into the *Camiel* court's determination—the antagonistic relationship between two warring political factions was one factor militating against the conclusion that a single scheme existed. Similarly, the absence of evidence tending to indicate a unified patronage system between the two houses of the legislature supported the conclusion that the schemes were not unified. Accordingly, the court concluded that, even when viewed in the light most favorable to the government, the jury could infer the existence of either two or four separate schemes, but not of a single unified scheme.

We believe that defendant's reliance on *Camiel* is misplaced, as the evidence supporting the existence of separate and distinct schemes was much more compelling in *Camiel* than that in the present case. The existence of hostile political factions and two separate patronage systems provided strong support for the *Camiel* court's conclusion that multiple schemes were involved. Conversely, in the present case, the evidence viewed in the light most favorable to the government establishes the existence of a much smaller scheme with a much more intimate relationship among the players.

Horton contends that there is no evidence linking his participation in the kickback scheme with Bandawat's decision to short-ship Chrysler. Moreover, he argues that the record will not support a reasonable inference that the two aspects of the scheme were intertwined. In this regard, the present case is not unlike *United States v. Tilton*, 610 F.2d 302 (5th Cir. 1980).

In *Tilton*, the defendant was convicted on four counts of mail fraud, one count of interstate travel to facilitate an unlawful activity, and one count of conspiracy to commit mail fraud. The facts established that Tilton served as maintenance manager for Sea–Land Incorporated, which manufactured containers for shipping freight and wheel chassis that attached to the containers so that they could be moved over land. In 1976, Sea–Land initiated a program which called for the modification of a group of chassis. Tilton selected Streeker Marine and United Trailer Service ("UTS") to do the reconditioning work.

Streeker Marine was owned by Robert Brenner and Jim Fiore, and UTS was owned by Joseph Cotrone and Robert Gillespie. Cotrone and Fiore were partners. The evidence further established that Tilton required Streeker Marine and UTS to pay him $20.00 per chassis as a kickback. UTS then inflated the invoices to Sea–Land in order to cover the bribes.

After concluding that this entire operation constituted only a single conspiracy and that Tilton was involved in it, the court concluded that Tilton could properly be convicted of all of the substantive counts in the indictment so long as they were reasonably foreseeable consequences of the alleged unlawful agreement. Thus, although there was no evidence that Tilton knew that the invoices to Sea–Land were being padded to cover the kickbacks, the court held that Tilton was properly convicted for mail fraud on the basis of these activities.

The mailing of the inflated invoices furthered the conspiracy and was a natural consequence of the unlawful agreement since the bribe money would have to be generated from some source. The most likely source was Sea–Land since UTS agreed to pay the bribe in exchange for a profitable contract. Consistent with this thinking, one could reasonably foresee

that the money would not come from the reserves of UTS but from Sea–Land in the form of overcharges.

*Tilton*, 610 F.2d at 309. We recognize that *Tilton* is distinguishable from the present case because it involved the conviction of a substantive offense based upon participation in a conspiracy. Nevertheless, in a scheme within the mail fraud statute, as in a conspiracy, the defendant need not be aware of or participate in all aspects of the crime. *Bibby*, 752 F.2d at 1124. "All that must be shown is that [defendant's] conduct aided the execution of the scheme." *Id.* In the present case, as in *Tilton*, the funds utilized to pay the bribe had to come from somewhere, and it is perfectly reasonable to assume that Chrysler would pay for the kickbacks in one way or another. Horton's conduct undoubtedly facilitated execution of the scheme to deprive Chrysler of money, and his participation in that single scheme compels the conclusion that no variance existed.

### C.

■ Horton also argues that the district court should have granted his motion for judgment of acquittal because the evidence established only that his conduct operated to deprive Chrysler of "intangible rights" in the form of Chrysler's right to have its business conducted honestly and its right to the loyal service of its employees. Because these "intangible rights" do not fall within the protection of the mail fraud statute, Horton argues that the district court erred in failing to grant his motion for a judgment of acquittal.

In advancing this argument, Horton relies on *McNally v. United States*, — U.S. —, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987), in which the Supreme Court adopted a narrower view of the mail fraud statute than had been previously adopted by the federal courts of appeals. The *McNally* case involved a workmen's compensation scam perpetuated during the administration of former Kentucky Governor Julian Carroll. Certain government officials entered into an agreement with Wombwell Insurance Company. The agreement provided that, in exchange for Wombwell's continuing position as the Commonwealth's agent for securing a workmen's compensation policy, Wombwell would share any resulting commissions in excess of $50,000.00 per year with insurance agencies controlled by Kentucky state officials. From 1975 to 1979, Wombwell funneled approximately $851,-000.00 in commissions to entities controlled by Kentucky state officials.

On the basis of this activity, the officials were charged with mail and tax fraud. The mail fraud count alleged that the defendants had devised a scheme to defraud the citizens and government of Kentucky of their right to have the Commonwealth's affairs conducted honestly, and to obtain money and other things of value by means of false pretenses and the concealment of material facts. The jury convicted the defendants, and this court upheld the convictions, holding that the mail fraud statute proscribes schemes to defraud citizens of their intangible right to honest and impartial government. The Supreme Court reversed, concluding that the statute reaches only schemes to defraud which involve money or property. However, the Court noted:

> [A]s the action comes to us, there was no charge and the jury was not required to find that the Commonwealth itself was defrauded of any money or property. It was not charged that in the absence of the alleged scheme the Commonwealth would have paid a lower premium or secured better insurance. Hunt and Gray received part of the commissions but those commissions were not the Commonwealth's money. Nor was the jury charged that to convict it must find that the Commonwealth was deprived of control over how its money was spent.

107 S.Ct. at 2882.

*McNally* is distinguishable from the present case. Although the indictment in the present case did charge that Horton's conduct deprived Chrysler of the right to loyalty and the right to conduct its business in an honest manner, it also charged that this conduct deprived Chrysler of money. At the trial evidence was presented which indicated that Chrysler did lose mon-

ey—approximately $479,000.00—because Carsonville engaged in short-shipping. The reason for the short-shipping, according to Carsonville's vice-president of manufacturing, was that Bandawat informed him that the company was not making enough money on the deal. Thus, there is evidence in the present case, not present in *McNally,* that the money Horton received was Chrysler's money.

Moreover, unlike *McNally,* the jury in the present case was not instructed that it could find defendant Horton guilty of mail fraud on the basis of the conclusion that some intangible right of Chrysler's had been violated. In fact, the court rejected the requested charge to that effect. Instead, the jury was charged as follows:

It is Defendant Horton's theory of the case ... that he did not intend to cause real or tangible harm to his employer, the Chrysler Corporation. It is Horton's theory, and he contends, that he did not in any way participate in actions designed to cause any over-billing or so-called shortshipments by Carsonville Metal Products to Chrysler. He claims that if, in fact, these things occurred, he claims he knew nothing about them. He further claims that because prices quoted by Carsonville to Chrysler were always competitive, he had no reason to believe that Chrysler would lose any money as a result of its contracts with Carsonville.

....

Now the statutes of the United States provide that whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations or promises, for the purpose of executing such scheme or artifice, or attempting to do so, places in any post office or other authorized depository for mail matter any matter or thing whatever to be sent or delivered by the post office department shall be guilty of an offense against the United States.

In other words, this section of the law, Title 18 U.S.C. section 1341, makes it a federal crime for anyone to use the Unit-

ed States mails in carrying out a scheme to defraud.

The Defendant can be found guilty of that offense only if all of the following facts are proved beyond a reasonable doubt:

First, that the Defendant knowingly and willfully devised a scheme to defraud, or for obtaining money or property by means of false pretenses, representations or promises; and

Second, that the Defendant used the United States Postal Service by mailing, or by causing to be mailed, some matter or thing for the purpose of executing the scheme to defraud.

The term scheme includes any plan or course of action intended to deceive others, and to obtain, by false or fraudulent pretenses, representations or promises money or property from the persons so deceived.

J.A. 297, 305–06.

In order for the jury to convict Horton, the instruction required the jury to find that Horton participated in a scheme to defraud Chrysler of money or property. The term "scheme" was defined to include "any plan or course of action intended to deceive others, *and* to obtain, by false or fraudulent pretenses, representations or promises money or property from the person so deceived." The clear emphasis on deprivation of money or property, combined with the absence of any instruction that the jury was free to convict Horton on the basis of the deprivation of Chrysler's intangible right to conduct its business in an honest manner compels the conclusion that *McNally* does not control the disposition of the present case.

In *Carpenter v. United States,* —— U.S. ——, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987), the Court emphasized the narrow scope of the *McNally* decision. The facts in *Carpenter* established that R. Foster Winans, a reporter for the *Wall Street Journal,* utilized confidential information obtained in the course of his employment to enter into a scheme with employees of the Kidder-Peabody brokerage firm to buy or sell stock based on the probable impact of the

confidential information on the stock market. Over a four-month period, the petitioners made net profits of approximately $690,000.00.

Petitioners argued that their mail and wire fraud convictions could not be upheld because they did not obtain "money or property" from the *Journal* within the meaning of *McNally*. The court disagreed, concluding that the *Journal* was deprived of much more than its right to its employees' honest service. Instead, the *Journal* was deprived of the confidentiality of its business information, as well as the timing of its publication, both property rights for the purposes of the mail fraud statute. "Petitioners cannot successfully contend ... that a scheme to defraud requires a monetary loss, such as giving the information to a competitor; it is sufficient that the *Journal* has been deprived of its right to exclusive use of the information, for exclusivity is an important aspect of confidential business information and most private property for that matter." *Id.* 108 S.Ct. at 321. Thus, after *Carpenter*, it is clear that the term "property" for purpose of the mail fraud statute should be broadly construed.

In determining whether Horton's conviction can be upheld in the aftermath of *McNally*, "we must look to the substantive allegations of the indictment and the jury instructions to determine whether the conduct alleged and necessarily found to have occurred by the jury constituted an offense." *United States v. Wellman*, 830 F.2d 1453, 1462 (7th Cir.1987). In the present case, as in *Wellman*, the indictment charged that defendants were guilty of depriving their victims of the intangible right to conduct business in an honest manner and to deprive the victim of money. In both cases, only a single scheme was alleged—a scheme resulting in the deprivation of a property right. Finally, and perhaps most importantly, in neither case was the jury instructed that it could convict on the basis of the deprivation of an intangible right alone. Because the term " 'scheme to defraud' was not defined in such a way as to allow conviction for conduct which was not an offense," the conviction in the present case, like that in *Wellman*, must be upheld.

This result is not inconsistent with two recent decisions from this court in which the impact of *McNally* was considered. In *United States v. Murphy*, 836 F.2d 248 (6th Cir.1988), defendant's conviction for mail fraud was overturned in accordance with *McNally*. The indictment in *Murphy*, unlike the indictment in the present case, was couched *solely* in terms of the deprivation of an intangible right. This difficulty was compounded by the fact that the jury instruction enlarged the scope of the indictment by permitting the jury to convict on the basis of the deprivation of money or property. Because the indictment did not charge an offense under the mail fraud statute as construed by *McNally*, and because the jury instruction represented an improper broadening of the indictment, the conviction for mail fraud could not be upheld.

Similarly, in *United States v. Baldinger*, 838 F.2d 176 (6th Cir.1988), defendant's conviction was overturned because the indictment was couched solely in terms of the intangible rights theory. Because the indictment in the present case clearly encompassed the deprivation of a property right, *Murphy* and *Baldinger*, do not control disposition of the present case.

The indictment in the present case charged a deprivation of money, which is clearly an offense within the mail fraud statute in the aftermath of *McNally*. The jury was charged that, in order to find defendant guilty of a scheme or artifice to defraud, it was required to find that Horton engaged in a scheme to deprive Chrysler of money or property. Finally, the evidence presented at the trial, viewed in the light most favorable to the government, supports the inference that Horton participated in a scheme to defraud Chrysler of money or property. Accordingly, the district court did not commit error in refusing to grant Horton's motion for a judgment of acquittal.

**D.**

■ Horton next argues that the district court committed reversible error in failing

to give a complete aiding and abetting instruction. The district court gave the following instruction on the concept of aiding and abetting.

In a case where two or more persons are charged with the commission of crime, the guilt of any Defendant may be established without proof that he personally did every act constituting the offense charged. The law says that whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

· · · · ·

In other words, every person who willfully participates in the commission of a crime may be found to be guilty of that offense. Participation is willful if done voluntarily and intentionally and with the specific intent to do something which the law forbids or with the specific intent to fail to do something which the law requires to be done, that is to say, with bad purpose either to disobey or disregard the law.

J.A. 308–09. Defendant Horton requested, and the trial court refused, the following addition to the instruction:

You, of course, may not find any defendant guilty as an aider or abettor unless you find beyond a reasonable doubt that every element of the offense as defined in these instructions was committed by some person or persons, and that the defendant knowingly and willfully participated in its commission.

J.A. 328.

The requested instruction is based upon an instruction contained in 1 Devitt & Blackmar, *Federal Jury Practice and Instructions* § 12.03 (3d ed. 1977). Defendant argues that the failure to give this requested instruction allowed the jury to find him guilty as an aider and abettor without first concluding that someone had actually committed the offense. Defendant further argues that the trial court's omission is especially significant because

the jury requested a "copy of aiding and abetting law" during the course of its deliberation.[2]

■ Before a conviction for aiding and abetting can be upheld, it is essential that the jury find that all essential elements of the underlying crime were committed by someone. *See United States v. Butler*, 622 F.2d 258 (6th Cir.), *cert. denied*, 449 U.S. 867, 101 S.Ct. 200, 66 L.Ed.2d 85 (1980); *United States v. Franklin*, 608 F.2d 241 (6th Cir.1979); *United States v. Barker*, 542 F.2d 479, 484 (8th Cir.1976) ("It is incumbent upon the Government to prove that the persons allegedly aided and abetted did commit the substantive offense."). Nevertheless, it is clear that no single provision of the jury instruction can be read in isolation, and that the charge must be considered as a whole. *See, e.g., United States v. Martin*, 740 F.2d 1352, 1361 (6th Cir.1984); *Engle v. Koehler*, 707 F.2d 241, 244 (6th Cir.), *aff'd by an equally divided court*, 466 U.S. 1, 104 S.Ct. 1673, 80 L.Ed. 2d 1 (1983). It is not error to fail to use the language requested by the parties if the instruction as given is accurate and sufficient. *Martin*, 740 F.2d at 1361.

Although we believe that the instruction requested by the defendant is more comprehensive, we conclude that the instruction given by the district court sufficiently advised the jury that it was required to find that the offense was actually committed before any defendant could be convicted as an aider and abettor. The instruction as given is replete with the word "commit," and the use of a similar instruction has been found not to constitute reversible error. *United States v. McCoy*, 539 F.2d 1050, 1064 (5th Cir.1976), *cert. denied*, 431 U.S. 919, 97 S.Ct. 2185, 53 L.Ed.2d 230 (1977); *cf. United States v. Rosa*, 705 F.2d 1375 (1st Cir.1983) (per curiam) (use of aiding and abetting instruction virtually identical to the one given by the district court in the present case found not to constitute plain error).

**2.** Upon receipt of this request, the judge instructed the jury to listen to the tape of the jury instructions that he had made for them.

## E.

■ Defendant next argues that the district court committed reversible error by utilizing the word "conspiracy" in the context of its aiding and abetting instruction. Horton contends that the use of the word "conspiracy" permitted the jury to convict him on the basis of nothing more than an agreement. We find this argument to be without merit.

Horton objects to the following portion of the district court's instruction:

Now, ladies and gentlemen of the jury, when a scheme to defraud is shared in by two or more people, it becomes a conspiracy and the acts of each party in furtherance of the common scheme is the act of all. If one's intent is to defraud when he joins a dishonest scheme, he becomes a part of the scheme, although he may know nothing but his own share in the aggregate wrongdoing. Formal agreement is not necessary, it being sufficient if there is an association in the purpose to defraud.

J.A. 309.

The instruction actually given was a variation upon a requested instruction which explains the manner in which evidence of an act by one member of a scheme can be admitted against other participants. *See* 1 Devitt & Blackmar, at § 1210; *compare Blue v. United States*, 138 F.2d 351, 358 (6th Cir.1943), *cert. denied*, 322 U.S. 736, 64 S.Ct. 1046, 88 L.Ed.2d 1570 (1944). (In case involving charges of mail fraud and conspiracy, court made statement of law serving as basis for instruction in present case).

Although we agree that use of the term "conspiracy" was unfortunate, our review of the record indicates that the jury was not permitted to convict defendant Horton on the basis of an agreement alone. The instruction as given clearly states that the defendant must participate in the scheme to defraud in order to support a conviction. Accordingly, the district court's use of the instruction complained of does not support the contention that defendant's conviction must be overturned.

## F.

Horton next contends that the district court gave an improper definition of the term "scheme or artifice to defraud." The district court instructed the jury that:

The term scheme includes any plan or course of action intended to deceive, and to obtain by false or fraudulent pretenses, representations or promises, money or property from the person so deceived.

J.A. 306. A virtually identical instruction has been upheld as an accurate description of the law in the aftermath of *McNally*. *Wellman*, 830 F.2d at 1463. Accordingly, this contention is without merit.

## G.

■ Defendant next argues that the district court erred in admitting coconspirator hearsay under Federal Rule of Evidence ("Fed.R.Evid.") 801(d)(2)(E) because there was insufficient evidence to support a prima facie case of conspiracy. Under this court's decision in *United States v. Enright*, 579 F.2d 980 (6th Cir.1978), if the trial court concludes that the evidence establishes, by a preponderance, that a statement was made by a coconspirator during the course of and in furtherance of a conspiracy, that statement is admissible under Fed.R.Evid. 801(d)(2)(E). The hearsay itself may be utilized in making this initial determination. *See Bourjaily v. United States*, — U.S. —, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987), and *United States v. Vinson*, 606 F.2d 149 (6th Cir.1979), *cert. denied*, 444 U.S. 1074, 100 S.Ct. 1020, 62 L.Ed.2d 756 (1980). Horton argues that because the evidence failed to establish the existence of a single conspiracy and because a substantial amount of evidence was produced regarding the conspiracy to pad the invoices to Chrysler, the district court committed reversible error in allowing all of these statements to be admitted under Fed.R.Evid. 801.

■ In view of our conclusion that the evidence is sufficient to support the existence of a single scheme, this contention is without merit. The mere fact that no con-

spiracy was charged does not preclude the use of coconspirator hearsay. *See United States v. McCullah,* 745 F.2d 350, 358 (6th Cir.1984); *Kendricks,* 623 F.2d at 1168 n. 5. In order to allow the jury to consider the coconspirator statements, the district court need only find by a preponderance of the evidence that a conspiracy existed. Because there was ample evidence to support this determination, admission of the coconspirator statements does not constitute reversible error.

### H.

Horton also argues that the district court committed reversible error in allowing Stephen Bandawat to testify as to the method by which Horton allegedly pressured him to make commission payments. Horton argues that the evidence was not properly admitted under Rule 801 because Fed.R.Evid. 801(d)(2) applies to only admissions by *party* opponents. He contends that because the evidence was offered not by the government but by a codefendant, it was not offered against a party opponent and thus does not fall within the scope of the rule.

In *United States v. Palow,* 777 F.2d 52 (1st Cir.1985), *cert. denied,* 475 U.S. 1052, 106 S.Ct. 1277, 89 L.Ed.2d 585 (1986), the court concluded that testimony from one defendant regarding another defendant's prior statements during the course of a conspiracy was properly admitted pursuant to Fed.R.Evid. 801. The admission, according to the court in *Palow,* must only be adverse to the defendant's position at trial and need not be made through a government witness. A similar position was adopted by the Ninth Circuit in *United States v. Ramirez,* 710 F.2d 535, 547 (9th Cir.1983). Accordingly, there is support for the proposition that these statements were properly admitted through codefendant Bandawat.

Alternatively, we conclude that there is ample support for the district court's conclusion that the statements were properly admissible because they were not offered to prove the truth of the matters asserted but were admitted to show their effect on Bandawat—*i.e.,* that he was a victim of economic duress. *See United States v. Wright,* 783 F.2d 1091 (D.C.Cir.1986) (substance of telephone call should have been admitted because it was offered not to prove the truth of the matters asserted but their effect on the listener); *United States v. Herrera,* 600 F.2d 502 (5th Cir.1979) (threatening statements properly admissible when used to show reaction to them and not the truth of the matters asserted); *United States v. Cline,* 570 F.2d 731 (8th Cir.1978) (statement admitted for purposes of establishing that it was said was not hearsay). Accordingly, we conclude that the district court did not abuse its discretion in allowing this testimony to be admitted.

### I.

Finally, Horton argues that the district court committed reversible error in allowing the government to offer John Sokol's testimony in rebuttal. During the course of direct examination, Horton testified that he entered into a manufacturer's representation agreement with Gagnier Fiber Products while he was still employed at Ford in an effort to have an established client base in the event that he lost his job at Ford. In rebuttal, the United States called John Sokol, the owner of Gagnier, who testified that he paid Horton a five per cent commission not because he needed a manufacturer's representative, but because he would not get any business from Ford if he refused to pay the kickback. This evidence was relevant on the issue of intent to defraud.

Horton argues that the evidence should not have been admitted because its admission violated Fed.R.Evid. 608(b), which prohibits the admission of extrinsic evidence of specific acts of conduct in order to attack credibility. The government responds by contending that the evidence was not admitted to attack credibility but was admitted under Fed.R.Evid. 404(b) to establish intent to defraud.

The district court has broad discretion in determining whether rebuttal testimony will be admitted. *United States v. Reese,*

568 F.2d 1246 (6th Cir.1977). In *Reese*, the defendant testified that he did not knowingly deal in stolen property. In rebuttal, the government called two witnesses who testified that they had sold stolen property to the defendant on previous occasions and that the defendant knew that the goods were stolen. We concluded that this testimony was properly admitted to show motive, intent and knowledge, and not merely for the purpose of attacking the defendant's credibility. Accordingly, its admission was held not to be an abuse of discretion.

Similarly, in *United States v. Smith Grading and Paving Inc.,* 760 F.2d 527 (4th Cir.), *cert. denied,* 474 U.S. 1005, 106 S.Ct. 524, 88 L.Ed.2d 457 (1985), the court concluded that evidence which might be inadmissible under Fed.R.Evid. 608(b) could be admitted under Fed.R.Evid. 404(b) even when presented in rebuttal. The court concluded that the evidence properly rebutted the defendant's denial of wrongdoing and thus could be admitted under Fed.R.Evid. 404(b). We conclude that *Reese* and *Smith Grading* provide strong support for the district court's decision to admit the evidence in the present case, and thus we conclude that no abuse of discretion occurred.

### III.

Although we agree that defendant Horton was not given a perfect trial, we conclude that none of the errors committed below, either singly or in combination, were sufficient to mandate reversal of the conviction. Accordingly, the judgment of the district court is AFFIRMED.