95 F.3d 1153
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Johnnie ROBINSON, James Robinson, Defendants-Appellants.
 Nos. 95-5171, 95-5172.
 United States Court of Appeals, Sixth Circuit.
 Aug. 27, 1996.
 
 Before: JONES, BOGGS, and COLE, Circuit Judges.
 PER CURIAM.
 
 
 1
 Johnnie and James Robinson, brothers who ran a crack cocaine manufacturing and distribution operation out of the Shelby County, Tennessee jail, appeal from their criminal convictions and sentences under 21 U.S.C. §§ 841(a)(1), 846, and 18 U.S.C. §§ 2, 924(c), on a multitude of grounds. We affirm in all respects.
 
 
 2
 * Events surrounding this criminal case began when Will Brian Odom, an inmate at the Shelby County, Tennessee Jail, contacted detectives of the Shelby County Sheriff's Department Narcotics Unit ("Narcotics Unit"). Odom told Detective Paul Harvey that James Robinson, another inmate, was involved in selling cocaine. Harvey initiated an undercover operation to catch James Robinson in the act. Harvey arranged for Odom and James Robinson, who had been cellmates once before, to share a cell on the Sixth Floor of the Shelby County Jail.
 
 
 3
 Narcotics Unit authorities selected Detective James Blackwell to play the role of Odom's father, King Phillip Littleton. Posing as Littleton, Blackwell met with James Robinson in the Shelby County Jail on January 6, 1994. Blackwell agreed to buy three kilograms of cocaine from Robinson for a price of $60,000. Blackwell assumed that the cocaine would be in powder form. During these negotiations, Blackwell learned that James Robinson's brother, Johnnie, was a guard at the Shelby County Jail. The brothers' aunt also worked at the facility. Because his brother, Johnnie, was a guard, James Robinson had easy access to the telephones at the jail, and could move about the jail freely. At the conclusion of the negotiations, James Robinson told Blackwell that he would contact Blackwell the next day.
 
 
 4
 On January 13, a week after their meeting, Blackwell received a pager message that displayed the number of another pager. He called that number and left the phone number of an undercover apartment being rented by the Narcotics Unit. Brian Odom returned the call to the undercover apartment shortly thereafter. Odom told Blackwell that while the price of $60,000 was to remain the same, the deal was now for only two and one-half kilograms of cocaine. Blackwell testified at trial that he could tell that Odom was being told what to say because Odom would repeat what Blackwell had said to some unknown person, who would then tell Odom how to reply to Blackwell. At the end of the call, Odom told Blackwell to expect another call soon.
 
 
 5
 When that next call came, the caller identified himself as "Boo."[1] Blackwell asked whether he was talking to "James," and the caller answered affirmatively. Blackwell also recognized the voice as James Robinson's. James Robinson told Blackwell that the cocaine exchange would take place at the Big Star supermarket on the corner of Millbranch and Shelby Drive in Memphis. James Robinson also relayed to Blackwell that his brother, Johnnie, would be making the delivery of the cocaine and picking up the money. Blackwell was told by James to expect a call from Johnnie once Johnnie got off work. Blackwell told James to make sure that when Johnnie called Blackwell's pager, Johnnie entered three zeroes after the phone number, so that Blackwell would know the incoming call was about the cocaine deal. James was the only person to whom Blackwell gave this instruction.
 
 
 6
 Later that same evening, Blackwell received a pager message displaying the three zero code appended to a telephone number. When Blackwell returned this call, he spoke with a person whose voice he did not recognize. The unknown caller and Blackwell agreed to meet in 20-30 minutes outside the Big Star supermarket. The unknown caller told Blackwell he would be driving a blue Mustang. Blackwell then met Johnnie Robinson, driving a blue Mustang, outside the Big Star. Blackwell told Robinson he had the "buy money" across the street in a car occupied by a friend. Johnnie became agitated because Blackwell had promised to come alone, but eventually agreed to show the cocaine to Blackwell. Johnnie pulled out a Blockbuster Video plastic bag, and Blackwell reached inside and felt what he thought to be crack cocaine. Blackwell then began walking across the street, ostensibly to get the money for Johnnie, but, in the process, actually giving the prearranged signal to waiting police to begin making an arrest.
 
 
 7
 As the police converged on Johnnie's car, they saw Johnnie reach down in front of his driver's-side car seat, despite their warnings for him to put his hands over his head. After hesitating for a few moments, he did put his hands up. Once Johnnie Robinson was pulled from the car, the police found a loaded semi-automatic 9-mm. pistol wedged underneath the seat in the area where Johnnie had been reaching. When the police searched Johnnie Robinson, they discovered a piece of paper with Blackwell's pager number, three zeros, and the words "King Phillip" written on it. The crack cocaine seized weighed 2.372 kilograms.
 
 
 8
 After his arrest, Johnnie Robinson confessed on videotape. He admitted delivering what he knew to be cocaine to Blackwell, but maintained that his involvement stemmed solely from being approached by Odom in the Shelby County Jail, who told Johnnie that he would be paid $1,000 by an unknown man to whom Johnnie would deliver the bag of cocaine. He insisted he was only told the deal was "60 for 3," and refused to acknowledge that he understood this to be $60,000 for 3 kilos of cocaine. Johnnie's police interrogator, Detective Howard, suggested to Johnnie that Johnnie's story seemed implausible because sending someone to deliver cocaine under such circumstances would be "bad business," but Johnnie stuck to it nonetheless. He refused to say anything else, even after Howard told him that the police knew more than Johnnie thought they did about the deal. Johnnie never mentioned his brother's role in the cocaine deal to the police during his confession.
 
 
 9
 At trial, Johnnie amplified on his story that he was ensnared into participating in the cocaine deal by Odom. He explained that Odom had asked him to make the delivery after Johnnie had once escorted Odom to the Shelby County Jail's property room to get his shoes. The additional element of the story not stated during his videotaped confession was Johnnie's claim that Odom somehow gave him the impression that delivering the cocaine was in James Robinson's best interests:
 
 
 10
 Brian had persuaded me that--the impression that my brother wanted me to do this and I was under the impression that maybe this is--I was helping him in some kind of way. And I guess before my shift was over, he had persuaded me that my brother wanted me to do this.
 
 
 11
 A hearing was held on the government's motion in limine to preclude the admission of any evidence about dangerous conditions in the Shelby County Jail. Johnnie testified that he had only agreed to deliver the drugs because Odom posed a threat to his brother. Johnnie proffered the evidence of dangerous conditions at the Shelby County Jail as relevant to his theory that Odom could pose a threat to his brother, James. At the same hearing, Johnnie testified that Odom had given him Blackwell's number out of earshot from his brother James. Detective Howard had specifically asked Johnnie in his videotaped confession whether he was under any kind of duress, however, and Johnnie had replied negatively. In the hearing on the motion in limine, Johnnie maintained that he had lied to police only because he feared for his brother's safety.
 
 
 12
 Odom testified in a different hearing before the district court that Johnnie was bringing cocaine into the Shelby County Jail and that James then had it "cooked" into crack by other prisoners. The resulting odor was strong enough that "anyone could" smell it in the Jail. James may also have bragged to Odom that he had 10 kilos of cocaine coming into Memphis every weekend.[2] Odom testified at the same hearing that he had gone with Johnnie to pick up shoes in the property room of the Shelby County Jail on the day of Johnnie's arrest, but that this trip occurred after Odom, Johnnie, and James had discussed the cocaine deal near the Jail's intake room telephone just before Johnnie placed his call to set up the meeting with Blackwell. This testimony suggested that Johnnie's claim that he had agreed to deliver the cocaine only after being confronted by Odom in the property room was false. Odom also testified that he did not try to convince James to have his brother Johnnie deliver the drugs.
 
 
 13
 Detective Howard testified at trial that crack cocaine was not usually sold in lots as large as one kilogram, but that in small quantities it typically sold at $100 per gram. He refused to extrapolate this price to a price of $100,000 per kilo of crack, however, because he did not know the benchmark price for sales of such a large amount of crack. He knew the benchmark price of one kilo of powder cocaine to be between $25,000 and $26,000 in Memphis. Detective Blackwell, however, testified that the price of powder and crack cocaine was basically the same.
 
 
 14
 Johnnie and James Robinson were indicted by a federal grand jury on February 9, 1994. The first count of the indictment charged Johnnie and James with conspiracy to distribute cocaine base in violation of 21 U.S.C. § 846. The second count charged them with aiding and abetting each other in the possession of 2.372 kilograms of cocaine in violation of 18 U.S.C. § 2 and 21 U.S.C. § 841(a)(1). Only Johnnie was charged in the third count of carrying and using a firearm in relation to a drug trafficking offense, in violation of 18 U.S.C. § 924(c).
 
 
 15
 Their first trial started on April 5, 1994, but ended in a mistrial on a motion by the defendants on April 7, 1994. None of the issues in this appeal are related to this declaration of mistrial. A second trial began on October 3, 1994.
 
 
 16
 Shortly before the second trial began, the government made a motion in limine to prevent the defendants from putting on any evidence about conditions in the Shelby County Jail. The district court granted this motion. James Robinson's counsel objected to Johnnie Robinson's counsel's suggestion that she would call Odom, and made motions for severance and a mistrial, both of which were denied. A colloquy with the district court led to some limitations being placed on Johnnie's ability to examine Odom, however. As a result, Johnnie made a motion for severance, which was denied. Johnnie's counsel then decided not to call Odom at all, although she did introduce a transcript of a phone conversation between Odom and Harvey.
 
 
 17
 Both Johnnie and James were found guilty on all relevant counts by the jury on October 11, 1994. After trial, Johnnie's counsel called Odom to testify as a tender of proof, in order to flesh out the record for appellate purposes. At one point during his testimony, Odom declined to say anything more. Counsel was appointed for Odom, and Odom ultimately claimed his Fifth Amendment privilege in relation to most of the questions that Johnnie's counsel attempted to ask him. Prior to sentencing, James Robinson's counsel filed a motion for funds with which to hire an expert who would testify as to the chemical properties of crack and powder cocaine. This motion was denied. James Robinson was sentenced on December 29, 1994 to 28 years of imprisonment, to be followed by 5 years of supervised release. Johnnie Robinson was sentenced on January 6, 1995 to 20 years and 8 months of imprisonment, also to be followed by 5 years of supervised release. Both defendants filed timely notices of appeal.
 
 II. JOHNNIE ROBINSON
 
 18
 A. Motion in Limine Related to Dangerous Conditions in the Jail
 
 
 19
 A district court's evidentiary rulings are generally reviewed for abuse of discretion. Review for abuse of discretion applies to rulings on issues of relevance under Fed.R.Evid. 401 and the probativity-prejudice balancing required under Fed.R.Evid. 403. United States v. Stull, 743 F.2d 439, 445 (6th Cir.1984), cert. denied, 470 U.S. 1062 (1985) (Fed.R.Evid. 401); United States v. Zipkin, 729 F.2d 384, 390 (6th Cir.1984) (Fed.R.Evid. 403). The district court did not err when it chose to grant the government's motion in limine to exclude generalized evidence about conditions at the Shelby County Jail on the ground that it was prejudicial. Obviously, this general evidence would have been vaguely probative of Johnnie Robinson's theory that he became involved in the cocaine distribution conspiracy only to protect his brother from harm. Evidence that other prisoners tended to use violence to solve disputes clearly makes it more likely that Odom may have posed a threat to James Robinson. However, it was not an abuse of discretion for the district court to have concluded that evidence of dangerous conditions at the Shelby County Jail was unduly prejudicial to the government's case. After all, Johnnie Robinson was on trial, not the Shelby County Jail. There was a significant possibility that allowing Johnnie Robinson to put on generalized evidence about dangerous conditions at the Jail may have deflected the jury from its proper focus on whether Johnnie Robinson was guilty of possessing and conspiring to distribute crack cocaine. Presenting such generalized evidence allegedly peripherally related to Johnnie Robinson's motivation for engaging in illegal behavior would not have shed light on the central issues the jury needed to decide.
 
 
 20
 Johnnie Robinson cites two irrelevant cases to support his argument to the contrary. See United States v. McLernon, 746 F.2d 1098 (6th Cir.1984); United States v. Swiderski, 539 F.2d 854 (2d Cir.1976). These two cases deal with entrapment--a theory that the excluded evidence may also have tended to support in this case--but Johnnie has decided not to appeal on the grounds that he was entrapped, so these cases are of no use to him. Attempting to bring in an entrapment argument through the back door in a challenge to the district court's ruling on the government's motion in limine advances neither his potential, though unmade entrapment argument, nor his actual argument that the evidence was wrongly excluded.
 
 B. Sufficiency of the Evidence
 
 21
 In reviewing a challenge to the sufficiency of the evidence, the court must determine "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." United States v. Ellzey, 874 F.2d 324, 328 (6th Cir.1989), quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979). All reasonable inferences are to be drawn in the government's favor. United States v. Christian, 942 F.2d 363, 367 (6th Cir.1991), cert. denied, 502 U.S. 1045 (1992). All conflicts in testimony are to be resolved in favor of the government. United States v. Wolfenbarger, 426 F.2d 992 (6th Cir.1970).
 
 
 22
 Here, Johnnie Robinson argues that there is insufficient circumstantial evidence from which a jury could have inferred the existence of a conspiracy. Ellzey, 874 F.2d at 328. This claim is completely meritless. Detective Blackwell testified that he spoke with James Robinson by phone and that James Robinson told Blackwell that his brother would deliver the cocaine. Blackwell gave James Robinson the three zero pager code, leading to a meeting where the cocaine was to be delivered to which only Johnnie Robinson, and not his brother James, came. And when Johnnie was arrested, he was found carrying a piece of paper with Blackwell's alias, "King Phillip," as well as "King Phillip's" pager number with the three zero code affixed. From this evidence the jury could easily have inferred that an agreement existed between Johnnie and James Robinson to sell crack cocaine.
 
 
 23
 C. Limitations Placed on the Examination of Odom
 
 
 24
 At trial, the government rested without calling Odom, but made him available for the defense to call. After a lengthy colloquy between the court and counsel for the defendants when it became clear that they wished to call Odom, the district court concluded, largely because of possible hearsay problems:
 
 
 25
 Well, either we can bring him in and go very slowly through his testimony--I'll have to do this, if either counsel stands up or makes any indication we need to have a conference at side-bar, we will just have to do that. I mean that is probably the only way we're going to be able to proceed, and that means, of course, that--because I don't want Mr. Shankman [counsel to James Robinson] or Mr. Cotten [Assistant U.S. Attorney], frankly--particularly Mr. Shankman, to have to do very much to get a side-bar. We don't want to make a big deal out of it.
 
 
 26
 After defense counsel asked at the conclusion of trial for permission to call Odom, in order to make an offer of proof, the district court stated:
 
 
 27
 I might say, and I want it to be real clear in the record. I didn't prevent you from putting Mr. Odom on at all. In fact, the procedure we adopted or I said we would follow, we would just go very cautiously and slowly, and you could ask any questions you wanted to, and we would rule on them at that time. So I am a little mystified by the offer of proof, but, you know, I don't quite know why we're doing it, but--because I would have let you ask the questions.
 
 
 28
 On these facts, Johnnie Robinson has no colorable argument that the district court erroneously excluded any evidence, because no evidence was in fact excluded. Defense counsel cannot be allowed to bootstrap an issue into validity for the purposes of an appeal merely by refusing to call a witness and then pretending that she had been left with only the second-best alternative of making an offer of proof. Johnnie Robinson's defense counsel claims that if the district court had allowed her to examine Odom as she wished, then Johnnie might have been acquitted. She does not point to any definite examples of the testimony by Odom that would have produced this effect--"It is appellant's position that ... had he been permitted to ask Odom those [unspecified] questions, the jury would have heard a more complete picture of the conduct of a Government agent in this cause, and would have acquitted the defendant." We will never know, and cannot speculate about, what Odom would have testified to had Johnnie Robinson's counsel chose to call Odom. We can only conclude that Johnnie Robinson's counsel made a tactical decision not to call Odom, perhaps because Odom's testimony would have further damaged her client. At the same time the decision was made not to call Odom, it seems clear that Johnnie Robinson's counsel was planning to appeal on the basis that her ability to examine Odom was somehow impermissibly circumscribed. This tactical decision may have been wise in that it could have prevented the jury from being exposed to more damaging evidence, but it left Johnnie Robinson without any basis for appeal from the district court's delineation of a procedure for examining Odom. The very creation of such a procedure proves that the district court did not prevent Johnnie's defense counsel from questioning Odom.
 
 
 29
 D. Sentencing on the Basis of Crack Instead of Powder Cocaine
 
 
 30
 Johnnie Robinson's arguments that he should have been sentenced on the basis of possessing and conspiring to distribute powder and not crack cocaine are confused. First, Johnnie Robinson argues that he and his brother were found by the jury to have struck a deal for selling powder cocaine, not crack. Second, Johnnie Robinson argues that Howard's testimony about the price of crack vs. powder cocaine in Memphis establishes that Johnnie Robinson should have been sentenced on the basis of powder cocaine, and not crack. Third, Johnnie Robinson points out that the United States Sentencing Commission has recommended reducing the 100:1 crack:powder sentencing disparity. Fourth, Johnnie Robinson argues that the preceding two "facts" add up to a conclusion that the district court should have chosen to depart downward from the sentencing range otherwise required by the Guidelines under 18 U.S.C. § 3553(b), because "an aggravating or mitigating factor, of a kind or to a degree, not adequately considered [in formulating the Guidelines]" was present in this case.
 
 
 31
 Of course, the form of the cocaine Johnnie actually possessed and conspired to distribute is what is relevant, not the form in which undercover police assumed they were purchasing cocaine. It is not even true, as Johnnie Robinson's counsel asserts, that Johnnie intended to sell powder and not crack cocaine, as he and his brother alone determined the form in which the cocaine was sold to Detective Blackwell--the police neither forced the Robinsons to sell cocaine in crack form, nor even suggested this as an option. The police may have intended to buy powder cocaine, but this is not relevant to either Johnnie Robinson's criminal conduct, or to his sentencing. It is not as if the type of cocaine actually sold is reasonably in dispute, and it is not credible to believe that Johnnie did not know what kind of cocaine he was delivering, given Odom's testimony at a prior hearing, which the district court was entitled to consider at sentencing, that the odor of powder cocaine being "cooked" into crack by James Robinson's associates permeated the entire Shelby County Jail. Indeed, Johnnie Robinson's counsel is careful never to claim that Johnnie Robinson did not know that he was delivering crack the night he was arrested.
 
 
 32
 Second, Detective Howard and Detective Blackwell's testimony regarding the price of powder vs. crack cocaine was not contradictory. Howard testified only as to crack's price in small, one-gram doses. He refused to speculate on the price of larger lots of cocaine base. Detective Blackwell testified that the price of crack and powder cocaine were identical, however. Even if the price at which the defendants sold the crack to the police was 25% of the market rate, as Johnnie Robinson is claiming, that fact would not entitle Johnnie to be sentenced on the basis of possessing and conspiring to distribute powder cocaine. Johnnie Robinson's citation to United States v. Raven, 39 F.3d 428 (3d Cir.1994), is inapposite because Raven is a case where a court of appeals held that the government bears the burden of proof to show that a defendant intended and had the capability to complete an unconsummated transaction for the sale of cocaine in a particular form. Raven is obviously distinguishable from this case, where the transaction was completed, and the government had the physical evidence to show that crack was the actual form in which the cocaine was sold.
 
 
 33
 Third, any recommendations the United States Sentencing Commission may have made regarding the crack:powder sentencing ratio are irrelevant to the form of the crack found in Johnnie Robinson's possession when he was arrested. The district court was obviously supported by a preponderance of the evidence in concluding that Johnnie Robinson had possessed and conspired to distribute crack, not powder cocaine. Finally, a district court's refusal to depart downward will not be reviewed by the Sixth Circuit. United States v. Pickett, 941 F.2d 411, 417-18 (6th Cir.1991). Moreover, there is no merit in an argument for a downward departure here because of an erroneous assumption by the police about the form of cocaine they arranged to buy from the defendants, or because of recommendations made by the Sentencing Commission, which, of course, lack the force of law. Congress has rejected the Sentencing Commission's recommendations for reducing the current sentencing disparity, leaving the federal courts with no option but to apply the Guidelines as they stand. United States v. Smith, 72 F.3d 1414, 1422 n. 2 (6th Cir.1996) (Jones, J., concurring).
 
 
 34
 E. Minor or Minimal Participant?
 
 
 35
 Johnnie Robinson's argument that he was a mere drug "mule" and therefore entitled to a sentencing reduction for being a minor or a minimal participant under USSG § 3B1.2(a) or (b) respectively, is wholly lacking in merit. To be sentenced as a minimal participant, the appellant would have to show that he was "plainly among the least culpable of those involved in the conduct of a group." USSG § 3B1.2, comment. (n. 1). This reduction is meant to be available only to someone who "played a single, limited role in a very large organization." United States v. Williams, 940 F.2d 176, 181 (6th Cir.1991). A defendant is a minor participant if he was "less culpable than most other participants, but [his] role could not be described as minimal." USSG § 3B1.2, comment. (n. 3). Here, Johnnie Robinson's participation in the criminal drug conspiracy was neither minimal nor minor. First, a relatively small operation was involved in this case, not a large operation involving many insignificant players. Second, Johnnie's participation was indispensable to the operation. He was the prison guard who gave James Robinson and Odom easy access to the Jail's telephones, and, of course, Johnnie was the only member of the conspiracy who was at liberty to make the delivery of the crack and pick up any ill-gotten proceeds. Finally, Johnnie also appeared at least to contemplate using force to protect his illicit product, as evidenced by his apparent reaching for a loaded weapon when police converged on his car to arrest him.
 
 
 36
 F. Claim for Entrapment Sentencing Departure
 
 
 37
 Again, a district court's refusal to depart downward from the Guidelines is not cognizable on appeal. Pickett, 941 F.2d at 417-18. USSG § 5K2.12 p.s. permits a district court to depart downward on the basis of "serious coercion, blackmail or duress, under circumstances not amounting to a complete defense." Section 5K2.12 p.s. is a type of "close, but no cigar" consolation prize departure. Here, Johnnie Robinson cannot even grasp at the smoke of an entrapment defense. In light of the discrepancy between the story in his videotaped confession, that he had merely agreed to transport some drugs in exchange for $1,000, and his story at trial that he feared for his brother's safety because of Odom's proximity to his brother, the district court was fully justified in denying the downward departure to Johnnie Robinson. Moreover, the district court stated at sentencing that it had taken a good look at Odom and James Robinson and the idea that the latter had anything to fear, given the slight physical stature of Odom, was simply not credible. The citations Johnnie Robinson offers to support his argument were properly deemed insufficient by the district court. See, e.g., United States v. Giles, 768 F.Supp. 101, 103 (S.D.N.Y.1991) (§ 5K2.12 p.s. departure available when government engaged in outrageous behavior), aff'd, 953 F.2d 636 (1991), cert. denied, 503 U.S. 949 (1992). Finally, it is important to note that § 5K2.12 p.s. is a policy statement and not a binding Guideline. See United States v. Reese, 71 F.3d 582, 585 n. 2 (6th Cir.1995) (explaining significance of the difference). Therefore, it would be especially incongruous to reverse and remand a sentencing on the basis of such a provision on appeal.
 
 
 38
 G. Sentencing Departure for Aberrant Behavior
 
 
 39
 The appellant's argument for a sentencing departure because his criminal conduct in this case was aberrant is also not reviewable on appeal. Most importantly, it would have been error to have departed downward on this basis under Sixth Circuit precedent. See United States v. Baker, 899 F.2d 503, 509 (6th Cir.1990) (district court erred in departing downward based on aberrant behavior of defendants). Johnnie Robinson cites only Third, Seventh, and Ninth Circuit precedent. Even if we agreed those cases stood for the propositions Johnnie Robinson claims they do and chose to follow them in our circuit, those cases would not require a district court to depart downward were his behavior truly aberrant.
 
 H. United States v. Bailey
 
 40
 Johnnie Robinson argues that under the recent Supreme Court precedent of United States v. Bailey, 116 S.Ct. 501 (1995), he cannot be convicted for violating 18 U.S.C. § 924(c), because he did not "use" a firearm "during and in relation to any ... drug trafficking crime." This argument is correct, as far as it goes. In Bailey, the Supreme Court held that the term "use" in the statute requires evidence sufficient to show an active employment of the firearm by the defendant. Applying this test, the Supreme Court concluded that having a weapon in the locked trunk of one's car was insufficient to support a conviction under § 924(c). Here, Johnnie Robinson kept the weapon he was found with under his driver's seat. "Placement for later active use does not constitute 'use.' " Id. at 509. Johnnie did not brandish, display, barter with, strike with, fire, or attempt to fire his weapon on the night he was arrested. Under Bailey, therefore, he did not "use" his weapon. Id. at 508.
 
 
 41
 Johnnie Robinson was, however, carrying the weapon for use, and this is sufficient to support a conviction under § 924(c). In fact, in Bailey the Supreme Court specifically noted that the broad reading of "use" rendered the statutory term "carry" superfluous, and comforted the government by noting: "The 'carry' prong of § 924(c)(1), for example, brings some offenders who would not satisfy the 'use' prong within the reach of the statute." Id. at 509. In United States v. Riascos-Suarez, 73 F.3d 616, 622 (6th Cir.1996), our court interpreted the "carry" provision of § 924(c) to require more than possession or storage of a weapon. The Riascos-Suarez court concluded that this requirement was met when a defendant had the firearm immediately available for use. On the facts of that case, the court concluded that the defendant had his firearm available for immediate use where it was protruding from the driver's side console of his car. Similarly, in this case, Johnnie Robinson had the gun available for immediate use where it was under the seat, and the evidence showed that he may have been reaching for the gun just before he was arrested. This possible attempt to grab the gun makes out an even stronger case that Johnnie Robinson was "carrying" the weapon than existed in Riascos-Suarez.
 
 
 42
 In United States v. Moore, 76 F.3d 111, 113 (6th Cir.1996), we held that "[a] definition of 'carry' that takes only availability into account ignores the term's most obvious connotation, i.e., physical transportation. Immediate availability is therefore a necessary, but not a sufficient, determinant." The court concluded in Moore that the arrest of a defendant for a drug trafficking offense did not support a conviction under § 924(c) merely because when the defendant was arrested after being found sleeping there were guns strewn about his room. Here, however, Johnnie Robinson both had his gun available for immediate use and was transporting it in his car. See ibid. (commenting favorably upon United States v. Cardenas, 864 F.2d 1528, 1530, 1533-36 (10th Cir.) (defendant "carried" weapon when it was "within effortless reach" as he drove his car), cert. denied, 491 U.S. 909 (1989)). Johnnie Robinson's challenge to his conviction under § 924(c) under Bailey therefore must fail.
 
 III. JAMES ROBINSON
 A. Sufficiency of the Evidence
 
 43
 The standard of review of James Robinson's claim that the evidence is insufficient to support his conviction is the same as that used in relation to the similar claim by his brother. James Robinson offers a number of senseless arguments in an attempt to demonstrate that the evidence against him was insufficient.
 
 
 44
 First, while acknowledging that Blackwell testified that Blackwell originally arranged the three-kilos-for-$60,000 deal with James Robinson, James argues that this evidence is not enough to convict him of engaging in a conspiracy to distribute crack because his discussion with Blackwell did not set a date for delivery, or specify the person who would make the delivery. Even if it were not true that other evidence indicated that James Robinson continued to be actively involved in the cocaine transaction, there is no requirement that a conspirator be involved in every phase of a conspiracy in order to be found guilty of participating in one. Here, where James Robinson negotiated the price for the cocaine deal and was Blackwell's initial contact, his role in the conspiracy has been adequately demonstrated. Second, James Robinson argues he could not have made the phone call placed by "Boo" to Blackwell because there was no evidence that he had access to a phone. This argument must fail because of the testimony that James was given regular access to phones by virtue of his relationship to his brother, and more importantly, because Blackwell testified that he recognized "Boo's" voice as James Robinson's. Third, James Robinson argues that he could not have been the person to whom Blackwell gave the three-zero code because Johnnie Robinson testified that he received this information from Odom. Assuming Johnnie's testimony on this point is credible, this testimony obviously does not preclude the possibility that James gave the code to Odom who could gave it to Johnnie. Fourth, James Robinson claims that there was no evidence he was directing Odom's involvement in the conspiracy. Of course, this is not a necessary requirement to prove James Robinson's culpability in this conspiracy. Moreover, the claim is untrue because Blackwell testified that Odom seemed to be taking instructions from someone else during a pivotal phone conversation. The jury was entitled to infer that Odom's puppeteer in the phone call was James Robinson.
 
 B. Motion for Severance
 
 45
 This court reviews a district court's decision to grant or deny a motion for severance under an abuse of discretion standard. United States v. Horton, 847 F.2d 313, 317 (6th Cir.1988). There is a strong policy favoring joint trials, and there is also a presumption that the jury will be able to separate the evidence against each defendant. Id. at 317. "When a defendant seeks severance, he has a heavy burden of showing specific and compelling prejudice...." United States v. Causey, 834 F.2d 1277, 1287 (6th Cir.1987). There was no specific and compelling prejudice in denying James Robinson's motion for severance. Odom did not testify and none of his negative statements about James Robinson were heard by the jury. His argument that he was prejudiced because the jury drew a negative inference from the fact that certain family members testified as character witnesses on behalf of Johnnie, but not on his behalf, is feeble. It is certainly possible that the jury drew such an inference, but in light of the fact that the jury also convicted Johnnie on all counts, it is not possible to say that such an inference constituted compelling prejudice. Finally, it is easy to dismiss James's argument that he was prejudiced by Johnnie's theory that Johnnie acted only to protect James, because this portrayed James as a weakling to the jury. This argument directly countered the government's theory that James was the mastermind of the drug conspiracy, and so the defenses of the two brothers in this regard can be seen as complementary, not antagonistic.
 
 
 46
 C. Need for Ex Parte Hearing under 18 U.S.C. § 3006(A)(e)(1) and Motion for Funds Under Criminal Justice Act ("CJA") to Procure Investigative or Expert Services
 
 
 47
 James Robinson argues that his motion requesting funds to employ two forensic chemists to give evidence bearing on the rationality of the crack:powder cocaine sentencing disparity should have been granted, and that he was entitled to an ex parte hearing on this motion under 18 U.S.C. § 3006A(e)(1).[3] James's attempt to attack the constitutionality of the crack/powder sentencing disparity is pointless in light of clear precedent in the Sixth Circuit upholding the disparity. Therefore, it could not have been an abuse of discretion for the district court to have denied James Robinson's motion for funds under the CJA, as he would only have used those funds to employ experts to attack the unchallengeable. See United States v. Day, 789 F.2d 1217, 1224 (6th Cir.1986) (applying abuse of discretion standard of review for denial of funds for an expert under the CJA).
 
 
 48
 James Robinson's argument that he is entitled to an ex parte hearing under § 3006A(e)(1), however, is a question of law that should be reviewed de novo. There is a circuit split about whether, when a district court entertains a request for funds to hire an expert under the CJA without an ex parte hearing, a court of appeals will reverse that determination automatically, or first require a showing of prejudice. Compare United States v. Hamlet, 456 F.2d 1284, 1285 (5th Cir.1972) (automatic reversal) with United States v. Bercier, 848 F.2d 917, 919 (8th Cir.1988) (showing of prejudice also required). The court need not decide the question of where to position itself in relation to this circuit split as James Robinson made a motion for funds under the CJA, and did not follow the statutory procedure in applying for an ex parte hearing. The purpose of the ex parte hearing is to allow the defense to avoid prematurely revealing its theory of the case to the government. United States v. Nichols, 21 F.3d 1016, 1018 (10th Cir.1994). When a defendant chooses to forego this procedure and reveal its theory to the government in a motion served on the government, there is no need to grant an ex parte hearing.
 
 
 49
 D. Constitutionality of 21 U.S.C. § 841 and USSG § 2D1.1 Under the Equal Protection Clause and the Eighth Amendment
 
 
 50
 James Robinson's constitutional challenges on equal protection and Eighth Amendment grounds to the crack:powder cocaine disparity are reviewed de novo. The Sixth Circuit has repeatedly rejected both claims. 21 U.S.C. § 841(b) and USSG § 2D1.1 do not violate equal protection of the laws as guaranteed under the Fifth Amendment's Due Process Clause. United States v. Reece, 994 F.2d 277, 278-79 (6th Cir.1992). Eighth Amendment challenges to the same provisions have also been squarely rejected. United States v. Avant, 907 F.2d 623, 626-27 (6th Cir.1990).
 
 E. Double-Counting Argument at Sentencing
 
 51
 James Robinson's final argument is that the district court engaged in double counting by sentencing him under both USSG § 4A1.1(d) and (e).[4] We review de novo the application of the Sentencing Guidelines to particular facts by a district court. United States v. Sanchez, 928 F.2d 1450, 1458 (6th Cir.1991). Double counting occurs when the same conduct on the part of the defendant is used to increase the defendant's sentence under two separate provisions of the Guidelines. It is obvious that there can be no double counting here. James Robinson received a permissible three-point addition, under § 4A1.1(d) and (e). Section 4A1.1(e) references § 4A1.1(d) and specifically contemplates that a defendant could receive a three-point total addition if otherwise eligible for both of the two-point additions under § 4A1.1(d) and (e) considered separately. Moreover, in United States v. Carroll, 893 F.2d 1502, 1510 (6th Cir.1990), the court upheld the application of a three-point addition to a defendant convicted of the crime of escape, which obviously includes punishment for committing a new offense while under another criminal sentence. Carroll is undoubtedly a stronger case for finding double counting than this case, and the double-counting claim in Carroll was rejected. Therefore, James Robinson's double-counting sentencing argument must also be rejected.
 
 IV
 
 52
 All of the defendants' arguments are lacking in merit and therefore we AFFIRM their convictions and sentencings in all respects.
 
 
 
 [1]
 Johnnie Robinson testified that his brother's nickname was "Bubba," not "Boo."
 
 
 [2]
 Odom later denied this. He had testified to this effect in the separate hearing on the government's motion in limine, however
 
 
 [3]
 Section 3006A(e)(1) reads:
 Upon request.--Counsel for a person who is financially unable to obtain investigative, expert, or other services necessary for adequate representation may request them in an ex parte application. Upon finding, after an appropriate inquiry in an ex parte proceeding, that the services are necessary and that the person is financially unable to obtain them, the court, or the United States magistrate if the services are required in connection with a matter over which he has jurisdiction, shall authorize counsel to obtain the services.
 
 
 [4]
 These subsections of USSG § 4A1.1 provide as follows:
 (d) Add 2 points if the defendant committed the instant offense while under any criminal justice sentence, including probation, parole, supervised release, imprisonment, work release or escape status.
 (e) Add 2 points if the defendant committed the instant offense less than two years after release from imprisonment on a sentence counted under (a) [sentence of imprisonment exceeding one year] or (b) [sentence of imprisonment of at least sixty days and not counted in (a) ] or while in imprisonment or escape status on such a sentence. If 2 points are added for item (d), add only 1 point for this item.